May it please the Court, my name is Robert Freeman. I'm here on behalf of the appellants, North Las Vegas Police Officers Mark Hoyt, Shane Skipworth, Leonard Cardinale, Brian Sacks, Mark Ceranowitz, Mike Carmody, and Mike Blackwell. This is their interlocutory appeal from the Nevada District Court's denial of their request for qualified immunity in connection with a Civil Rights 1983 lawsuit that was brought by the appellees in Nevada. We contend on this interlocutory appeal that the Nevada District Court made at least three errors of constitutional significance and if the errors had not been made, we believe that the court would have granted the motion for summary judgment and either found no constitutional violation in the first instance or at least granted the officers qualified immunity if they found a constitutional violation. It's difficult to determine what errors were committed by the Nevada District Court. There's no written decision. There are, however, two transcripts of two separate hearings that were held on the issue of qualified immunity and we provided those in the record on appeal. The first error that seems apparent from the record is that the court failed to apply the Saussure test to the facts. In fact, at one point in the written decision, the court, and this is a quote, said, like many cases of this sort, this is factually intensive and thus not right for summary judgment. And I think that's an indication that they tried to apply the test for reasonable force, found fact issues, and decided to punt on the issue of qualified immunity and not Well, except for, let me just ask you this. I'm hearing, do you contend that your clients are entitled to qualified immunity because the plaintiff's proffered evidence that should be discounted? Or are they entitled to qualified immunity even if the plaintiff's proffered evidence is viewed in the light most favorable to the plaintiffs? I believe that even if you view the plaintiff's evidence in the light most favorable to the plaintiffs, the officers would still be entitled to qualified immunity. Well, it has to be that, doesn't it? It has to be that. And so there are things in there that I see as, you know, and when you do that, then you look at, yeah, then the court can make a legal determination. You know, there are always going to be some factual disputes, but that's not the end of the inquiry. But there are things that I see in here. Obviously, there are very different accounts of what occurred that went on. You've got, you know, you've got the wife, you've got the neighbor, you've got people saying that the deceased was yelling that he couldn't breathe and that there were indications. You've got things in the record that indicate, you know, I'm not saying that, you know, the officers may win at the end of the day, but what do we do with the type of things that indicate that this guy was, there is evidence in the record that people say that he said he was struggling for breath, that they continue to do, there's evidence in the record that officers are aware that certain techniques can result in, you know, people dying. Right. And so how do we, for purposes of this, get past that? Okay. The appellee points that I think you're describing come from witness statements, some from the appellee herself, but witness statements of the Gondinis that were across the street and witnessed some of the event from their upstairs window across the street. Now, admittedly, in their affidavits, they said some things that are inconsistent with even statements that the appellee, Joanna Romo, made. For instance, in their affidavits, the Gondinis say that they saw Roberto Arce in the garage standing up and talking to the officers prior to the confrontation and that he was handcuffed while he was still standing up and that it was only after he was handcuffed that he was taken to the ground. Well, we know that's not true because the appellee, Joanna Romo, testified that the garage door was still down when the initial confrontation went on and that by the time she opened it, her husband was already on the ground and was being handcuffed. But it seems like, okay, right there you're just saying, okay, well, then since we know that's not true, let's just resolve that factual dispute, not give them all inferences in favor, and weigh the evidence, which is exactly what you're not supposed to do here. Okay. From time to time, and I gave you a citation to a case that was decided this last April called Gregory v. County of Maui, from time to time this and other courts have determined that the fact issue, the proposed factual dispute is not supported by the record and thus doesn't create a factual issue that defeats summary judgment even in a qualified immunity case. And I would submit that this is one of those. It just couldn't have happened that way. And if you look back at their prior testimony, the Gondinis testified at the inquest, and you have the inquest transcript there, and they said what they saw at the inquest. And they both said consistently that the first thing that they saw, they heard a noise, they went to their window, they looked out, and at that time the garage door was up, Roberto Arce, who they couldn't really see because there were officers in the garage, but he was clearly already on the ground and being or was handcuffed or was being handcuffed. So directly conflicts with what they said, consistent with what Joanna Romo said herself, that it was only after that event that the garage door was even raised. Also particular, I think, to that statement in their testimony is that they admitted that they were at least 50 yards away. Michelle Gondini said at inquest that she couldn't see whether Roberto Arce was really struggling, but she could hear it. And she heard the struggle. She heard the grunts and voices of the officers and Roberto Arce, and she took from what she heard that the struggle was still going on. So that's an actual. Here's really the question. I think you have to make a good point that if there are some things that are so improbable or sort of physically impossible, they might not really rise to the level of a factual issue, and I think you cited some cases, and I appreciate what you're saying there. I guess the question is, does that really apply here? This is not atypical of any time you have like a minor melee where it's like this big cacophony, lots is going on, people are seeing and hearing different things. There's some negative statements against the officers about, you know, keeping their story straight, and that's sort of, you know, again, inferences to the plaintiffs here. So if you're left with the notion that a gentleman who's committed no crime, you know, is pulled down, hogtied, and then basically asphyxiated, and you have to answer that first question of, well, does this rise to the level of a constitutional violation, if you believe all that? I think you might have to say, well, yes, it does. Then it seems to me your challenge would be to say, but the law wasn't so clearly established or there's something about this situation that's different than others that would make it possible for my officers to have a reasonable belief and therefore qualified immunity. So we have to put it in the saucier boxes. And I know the judge in the second order did that. Well, he mentioned the case, you know, and I agree he mentioned the case. By that time we had given him supplemental briefs on qualified immunity, and he kind of knew what the issue was going to be. And I understand what the Court's saying, but I want to be clear. I think you can take everything that the plaintiff says and you could still find not just the court did in this Gregory case. In the Gregory case, if you look at those facts, and I apologize that I didn't get it to you earlier, but it was obviously decided after the briefing. And if you look at that case, in that case the decedent died after a struggle with the police. He was a trespasser at a recording studio in Maui. The police were called because he refused to leave. There was some evidence that the police were told that he had hit somebody at the recording studio and that he was probably high on drugs. He was acting funny and they felt he was high on drugs. The police got there. They tried to get him to leave. He wouldn't. After they asked him several times, you know, come peacefully, they had to go hands-on. They went hands-on with him. They took him to the ground, and he died. He had a heart attack and died. During the struggle, he said, I can't breathe, I can't breathe. The officers apparently replied, you can breathe because you're talking. If you can talk, you can breathe. The medical testimony in that case was exactly that. If you can talk, you can breathe. Though this Court sat in judgment on that case and decided that that was not an unconstitutional exercise of force. They went through the ---- And in that case, did they put a B-mask over him and have him hogtied on the ground and somebody allegedly whiffed a leg or arm or some body part on his neck? They had him on the ground. No, there's no B-mask. There's no B-mask. But I'll respond to the B-mask. The B-mask was undoubtedly there. All of the officers testified that they didn't get it over his head. And if you look at the autopsy report, it was not ---- there was no finding in the autopsy that the B-mask had anything to do with Roberto Arce's death. There was no finding that ---- I think there was an allegation that somebody batoned him. That was also ---- there was no finding at the autopsy that was consistent with him being batoned. And the autopsy said, is it positional asphyxiation, or what was the word that they used? They called it positional asphyxia. They called it positional as the coroner who performed the autopsy was never deposed. She doesn't work at the Clark County Coroner's Office any longer. But we ---- and if I get into causation, I'm sure that's a fact issue. I mean, we presented you with Dr. Newman's affidavit on what the real cause of death was, that it was cardiac arrest. He definitely had a cardiac arrest. But that does make it a factual dispute there, right? What? That makes it a factual dispute on the causation part. Yeah. And what I want to say is what this comes down to, and I've been here before arguing similar cases, is what this comes down to is what could the officers have done differently that would have avoided this result. And you know that you have another case, Drummond v. City of Anaheim. I want to address that. Yeah. And in Drummond, the court overturned a district court's grant of qualified immunity, this court did, and pointed out things that were important to them in that case. And first and foremost, I think, was this idea that Mr. Drummond was not a threat. He hadn't committed any crime. In fact, these very officers had every reason to know Mr. Drummond because they had seen him the day before. They had gone out to his place because he had been reportedly acting bizarrely. They even took him to try to get his meds, his bipolar medication, and they knew he didn't get any because they took him to the pharmacy. He didn't have his insurance card. He couldn't afford it. They brought him back. So the very next day when they get called again, they know. They know exactly what it is that they're going out there to see. They know what they're going to face. And despite that, they didn't make any effort to talk him into compliance or talk him into custody. The witnesses said that one officer went directly from the car right to tackle him, that they threw him to the ground, that two officers knelt on him, one officer at least of which was 60 or 65 pounds heavier than Mr. Drummond, that they stayed on top of him for 20 minutes after he was handcuffed and after he had ceased any kind of resistance at all. In fact, if you look at the opinion, I can't find that he resisted any time, even before he was handcuffed, that while he was being handcuffed or after he was handcuffed, other officers stood there and joked and were laughing. And obviously they didn't know what was going to happen, but this court found that that was evidence that nobody was taking Drummond as a serious threat and they didn't need to use this level of force on him. And so the court decided that the officers weren't entitled to qualified immunity, that there was an apparent constitutional violation, taking those facts in the light most favorable to the plaintiff, and that there was no way to avoid the conclusion that they had violated clearly established law. Well, in our case, there are crimes. Mr. Arce was high on cocaine. He was terrorizing his family. His kids were in an upstairs – this is not disputed. His kids were in a closet upstairs hiding from him. You have the 911 call. Well, but, you know, in fairness, you have his wife saying, look, I block myself because I'm afraid of what he might do. We know that he can be erratic. But he hadn't terrorized them. He hadn't committed – did they have probable cause to arrest him for anything upon arrival at the garage? Well, the Grace Flores had testified – Why don't you answer that question first? Yeah. Yes or no? I think they had probable cause to arrest him for taking illegal drugs, for suspicion of taking illegal drugs, and to investigate the crime that was alleged to have happened. But they don't know, really, that he took illegal drugs. They just know what they were told, what the dispatcher was told. She said he was high on cocaine or crystal or something like that. Cocaine. Yeah. And she had seen it before. You know, she knew what he did and what was going to happen, and she had seen it before. She was – Ms. Romo was in the best position to know what the probable outcome of this was going to be. She's the one who placed the call. She's the one who summoned the police. The police are there to investigate that crime right away. They're not allowed to do that because Roberto Arce is not going to cooperate. And Joanna Romo witnessed that. That's not disputed. She brought them to the garage. She's the one who witnessed the officers trying to get him to get on his knees, and voluntarily he wouldn't. She's the one who witnessed the initial confrontation, the initial fight. She's the one who testified that the officers were not going to be able to control him, that he was worked up far too strong, and that he was going to be able to overcome the first two officers that were there. So – Were the crimes for which you say that they had probable cause to arrest, were they misdemeanors or felonies here, like ingestion of cocaine? No, I think it was a misdemeanor. Well, it's going to be a misdemeanor. Is that even a crime? In other words, possession is a crime, but if you – Well, and they didn't find anything. So I – you know, all I can – my yellow light's on. All I can say is, is that they were there to investigate the crimes that were alleged in the 9-1-1 tape. They didn't get a chance to draw any conclusions probably about probable cause because, you know, they weren't allowed to investigate. This is what happened first. Just like the officers in Gregory weren't allowed to investigate whether Mr. Gregory was going to really be a trespasser, whether he was really high on drugs, because he went straight to physical confrontation, too. And I think – Do they know about Roberto from prior calls there at that house? You know, the record has seven prior police visits to Roberto Arce's house, all for the same thing, all for him being high, one of which involved SWAT. The officers who testified, I believe they said that they had never been there themselves, but they did – they were aware of the address. But I believe they said that it had never been them that had been directly involved. But, you know, when you look at – if you look at Drummond and you look at Gregory, what you're left with is this concept of what are the police officers – what could they have done differently? You know, what would have changed the result? And in Drummond, it's easy. Get off him. He's not fighting, right? In Gregory, they didn't have the luxury of getting off him. He fought right to the end, and that's what happened in this case. And there's no real evidence to the contrary. He fought – all of the officers testified that he fought right to the end. In fact, paramedics were there trying to bind his ankles together so he wouldn't kick anybody when they got him to his feet when he relaxed and had his medical emergency. So, you know, you don't have the Drummond facts. You don't have – this guy was 250 pounds. You don't have a little guy who's not a threat to anybody. You don't have officers there who are clearly not taking this situation seriously and laughing and joking. What you have is officers who are exhausted from the fight they've been in and are trying to catch their breath after being exhausted by that fight. You know, the plaintiff's expert, we take issue with the plaintiff's expert report because I think it's not an admissible piece of evidence. I think it's not a declaration. It's a letter. It's supported. Did you raise a hearsay objection concerning D.P. Van Lerachom's report before the district court? Yes. And can you tell me where in the record it is? Yeah. Why don't we do this one? You can provide us a copy later. We don't want to use up your time. And then I guess the same question related to that, if you need to look it up. I didn't see that argument in your opening brief, only in the reply brief, but maybe you can advise us on that when you come back as well. Okay. Thank you. And I'll read. I have a couple minutes, so I'll skip it. Yes. May it please the Court, Cal Potter, on behalf of the Arce family plaintiffs to address the issue of the case before the district court. I think in all fairness to Judge Mahan, the district court judge at Excerpt of Record 943, the second order, he does address the sassie issues and does find the constitutional violation. It's a little breezy. I'm sorry? He said it's a little breezy. Yes. He cites the case. But in all fairness to him, he cites the case. He does the best. But he's also the district court judge in the Davis v. City of Las Vegas case, came down before that. Although he doesn't mention that by case name, he says that he is aware of his obligations. And more importantly, that's really what this is. It's a straight application of Smith v. Hemet as well as Davis v. City of Las Vegas. And you have the Graham factors, which this court instructed Judge Mahan in the Davis case, the severity of the crime. Once again, there is no crime here. There's erratic behavior. There's no immediate threat, unlike the Hawaii case that was just presented. Mr. Arce was not armed. And thirdly, he was not attempting to evade the police. Indeed, there's testimony from his wife that, in fact, he was trying to deal with them and talk to them. What's the best evidence that you have that it was excessive force? Is that from the wife, or is it from the neighbors, or what is it from? Judge, the most important thing about this case that makes this case different from all these other cases are the Gandinis. Mainstream America comes to a police misconduct case. You have a schoolteacher and a dental hygienist. These people are people that Well, it doesn't make any difference, really, what their status in the community is, I suppose. It's what they said. Right, and that's what's important here. You have them saying that, indeed, the officers were all on top of him, that, in fact, he was trying to cooperate. He says that Mark Hoyt, Shane Skipworth, the individuals that are first there, knees in the back, Carmody and Canale, the other officers that then do the same thing, this man's hogtied. And that's the testimony of not only Mrs. Arce, Joanne Romo, Arce, but Mr. and Mrs. Gandini. And that's what was impressive to the district court when he was making the decision. You can look at the transcripts. That's what he said changes everything in this type of case. It isn't simply What's the part about the garage door being down and they couldn't have seen that? Is that correct? Well, I don't think, you know, once again, those are factual disputes. The light most favorable to the plaintiffs, which this Court is duty-bound to follow in terms of de novo review, states that they were able to see that from the second-story window. And that's what's important. More importantly, they also testified that these officers stated we had to get our story together in the sense or words to those effect that we weren't using illegal holds. And so you have these people who were neighbors, who were people. And I think it means a great deal in terms of looking at credibility, if indeed that's what we're doing here is looking at credibility of the facts. These individuals, one is a schoolteacher. The second is a dental hygienist. Those are jury trial arguments. Here it's what are the facts most favorable to the plaintiff. And those are the facts most favorable to the plaintiff, in addition to his wife. The fact that they also placed this mask on him on backwards so that it's covered. And you also have the officers stating that there's acknowledgment on their part that he could not breathe, that I can't breathe, take the mask off of me. Ms. Potter says what you have here is a guy who's out of control. He's high on drugs. His wife is scared to death of him. So she, like, locks the kids upstairs and locks him in the garage, calls police. Police come in. Things get a little chaotic. What they're trying to do is subdue him. And it seems that when you get right down to it, the question is, given his size and flailing around and erratic nature, you know, how far can they go to subdue him? And why wasn't it reasonable force under the circumstances? Because of the fact that they put the knees into the back. They also get on top of him. And then you have a compression situation. You don't need to know anything other than people can't breathe when they're laying prone on the floor and that they have police officers on numerous numbers on top of the back. They can't breathe at that point in time. There's acknowledgment on the part of the department. More importantly, the policies of this department, as well as every policy, every department in the United States, says that if you have an individual and you're going to hogtie them, and Grumman tells us that hogtieing is not the best policy to be followed, that, indeed, you have to set the individual up. There's absolutely no testimony from anyone that, in fact, he was brought up. The testimony is that he was brought up. You admit that they had a right to subdue him? I'm sorry? You admit that they had a right to subdue him to try to get him under control? A right or a policy. What you have here is a situation where they don't wait for the sergeant to show up. And so they overreact to the situation. They could have stood there. They could have allowed him or protected him if, indeed, that was what they were trying to do. The other argument, which maybe the court doesn't want to hear, but there's a part here of Carmody and the excessive force that he's giving this gentleman some street justice here. They tell the wife to leave, and she says, you know, she has some concerns. Now, she doesn't speak very good English, but she understands some English. She believes that these officers at this point in time are harming her husband. And that's very important from the standpoint of the family, and whether that's, once again, arguing something that would be argued to a jury. But that's the side most favorable to the plaintiff. Duty-bound is the attorney to represent these people and make that kind of statement, even though it may not be palatable to some people. But that's certainly an inference that can be drawn, that they were teaching this man a lesson, because they'd been out there on numerous occasions. She had reasons to believe that he would then be placed in an ambulance and taken for detoxification if, indeed, that was what was going to happen. They didn't wait for medical. That's the other thing. You can wait for medical to show up. Well, they certainly seem to be out of control and either under drugs or insane in some way, maybe. Correct. And those are the same facts that you have in terms of, or the potential to be out of control. Because you have testimony from the neighbors that he's standing up at that point in time. But there's no question that she called to get help, and she'd called in the past to get help and received help from medical people. And that's the expectation that one would have in trying to have a loved one taken care of. Wait for the medical people, the individuals that can deal with these situations, to take care of it. And that didn't occur in this situation. I would also state that Chu versus Gates looks to other factors, warrants. There's no warrant here, whether he was armed. If there's more than one officer, we have multiple officers here. Once again, what we're talking about, whether sober or under the influence, and then if there were additional charges. There were no additional charges outstanding on this individual. Well, if they had waited for the medical people, he would still have had to have been subdued, I suppose, right? He would have had to have been dealt with. But what you have here, and what frequently occurs with emotionally disturbed people, rather than take the loved one away, the wife, you have those individuals either there to talk to the individual or talk them down. That's the training that these gentlemen were given in terms of dealing with emotionally disturbed people. Well, I think that that's the type of micromanaging that's not appropriate for a summer judgment. You know, obviously the facts that are relevant here have to go with what evidence did plaintiff introduce as to excessive force. And what Smith versus Hema tells us and Davis says is look to the alternative methods, indeed, if an emotionally disturbed person is there. And I would submit that based upon that, as well as the testimony that was talked about from the coroner's inquest, counsel for the officers wants to have it both ways in terms of what he'll take from the coroner's inquest. He'll take the Gandini's testimony in part, but in other part he doesn't like what they're stating and therefore will not use the deposition. But, indeed, the testimony is clear from the coroner, Deborah Smith, when she stated not only that she believed it was positional asphyxia, but she believed that Mr. Arthie's death was due to a homicide by the hands of another individual. And that's what's important in terms of making those determinations. I would also take a look at the issues of expert restraint asphyxia, positional asphyxia, the fact that it was a medical emergency. And I would look to the concurrent causes. We've cited the court to Northington versus Marin, a case that deals with adopting the second restatement of courts on concurrent causes dealing with joint and several liabilities. Your expert report, you don't have a ñ it wasn't in the form of an affidavit or a declaration. Is that right? It was his statement. That's correct, Your Honor. It was in terms of his statement that he was made. But it was ñ but it wasn't ñ How good is that? Well, I think what we were relying upon was the coroner's testimony. But, once again, it wasn't raised until the reply brief. It wasn't brought up as an issue. If it's brought up on reply for the first time, it's uncognizable by this Court. And unless you have other questions, I would submit my argument at this time. All right. Do you have some time for rebuttal? Yeah. I want to point out that you can find an objection that I made in the district court at the excerpt record 0856 and 0857. What does it say? The first is that I find most of the evidence that's attached to the plaintiff's opposition is in it. Wait, wait, wait. That's all mumble mumble. I'm sorry. Relevant statement is I find most of the evidence that is attached to the plaintiff's opposition is inadmissible. Even Mr. Van Blaricombe's report is inadmissible. It's simply a letter. It's not sworn testimony. Many of the foundational documents referenced in that letter are inadmissible hearsay documents, good reasons for you not to consider it. You've explained that you don't give much weight. But to the ñ and what I meant by that is he'd already said he doesn't know whether he gives any weight to expert testimony. But to the extent that it is given weight, it's not admissible. That's what I said. In response to some of the things that Mr. Potter said ñ Let me just close the loop on that. Did you make that argument in your opening brief? I didn't. I made it in the reply brief. In response to some of the things that Mr. Potter said, you know, yeah, there's no real doubt. If you want to find a fact issue in these cases, you can find one. I mean, but you have to decide whether it's a material fact. That's your job. And the way you performed that job in Gregory, there was a witness in Gregory who contradicted the police. I think the witness said something like, I don't think he was dangerous. I think the person in Gregory was holding a writing pen, and the witness said he wasn't holding a writing pen. And the Court weighed those facts and decided that that wasn't really supported by the record and that that wasn't going to arise to the level of a fact issue that would defeat summary judgment on reasonable force. So when you look at the Gundinis statements, certainly you have to take them in the light most favorable to the plaintiff, but you have to take the plaintiff's story too. And if the plaintiff is saying one thing and the Gundinis are saying another, I think you have to discount what the Gundinis are saying, especially in light of the I think that's wrong. I think that's an absolutely, that would be weighing the witnesses. I think that if you determine that something, you know, if they said that the moon was green cheese or, you know, if they say something that's totally absurd that totally couldn't, if they said they saw something and they're blind, you know, that, but weighing the evidence. Well, and I don't think I'm asking you to do that. What I'm asking you to do is determine what's possible. What they said in their affidavit is not possible. And it contradicts even their own prior statements, and it surely contradicts the statement of the primary plaintiff aptly in the case. So you've got to dogfight at trial. No doubt about that. If you go to trial or if there is a, if you don't have qualified immunity. I think the court made my point for me on waiting for the medical people. You know, as a practical matter, as Judge Seiler says, they're going to be subdued anyway. They have to be subdued. I've never met a paramedic who's going to go in there and fight with a guy to try to give him medical attention. And I think when I was here before on a case called Parker v. City of North Las Vegas, the judges on the panel said, and I think it's the relevant question, what could the police have done differently? And what you really have is just one statement that was made in Van Blericombe's report, and it said get him up off the ground, turn him on his side and get him up off the ground after he's handcuffed. But you can't do that if the guy's still fighting. You just can't. And you can do that if it's safe to do that, but all of the testimony in your record on appeal is it wasn't. He was still fighting. He was still kicking. They're not going to get him up and let him kick and blow out somebody's knee or end some police officer's career. They're going to wait until they have control of the situation, either through his compliance, voluntary compliance, or through restraining his ankles together so that he can't kick them when they bring him up to his feet. I'll submit it on that. Thank you. Thank you. Thank both counsel for your arguments this morning. The case just argued, RC v. Blackwell is submitted. We'll hear argument in Schofield v. Metropolitan Life Insurance. Thank you. Thank you. Thank you.
judges: McKeown, Callahan, Siler